**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**(Columbia Division)**

| | |
|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC, on behalf of itself, its patients, and its physicians and staff; | |
| GREENVILLE WOMEN'S CLINIC, on behalf of itself, its patients, and its physicians and staff; and | |
| TERRY L. BUFFKIN, M.D., on behalf of himself and his patients. | |
| *Plaintiffs,* | |
| v. | Case No. 3:21-cv-00508-MGL |
| ALAN WILSON, in his official capacity as Attorney General of South Carolina; | |
| EDWARD SIMMER, in his official capacity as Director of the South Carolina Department of Health and Environmental Control; | |
| ANNE G. COOK, in her official capacity as President of the South Carolina Board of Medical Examiners; | |
| STEPHEN I. SCHABEL, in his official capacity as Vice President of the South Carolina Board of Medical Examiners; | |
| RONALD JANUCHOWSKI, in his official capacity as Secretary of the South Carolina Board of Medical Examiners; | |
| JIM C. CHOW, in his official capacity as a Member of the South Carolina Board of Medical Examiners; | |
| GEORGE S. DILTS, in his official capacity as a Member of the South Carolina Board of Medical Examiners; | |

DION FRANGA, in his official capacity as a
Member of the South Carolina Board of Medical
Examiners;

RICHARD HOWELL, in his official capacity as
a Member of the South Carolina Board of
Medical Examiners;

THERESA MILLS-FLOYD, in her official
capacity as a Member of the South Carolina
Board of Medical Examiners;

JEFFREY A. WALSH, in his official capacity as
a Member of the South Carolina Board of
Medical Examiners;

CHRISTOPHER C. WRIGHT, in his official
capacity as a Member of the South Carolina
Board of Medical Examiners;

SCARLETT A. WILSON, in her official
capacity as Solicitor for South Carolina's 9th
Judicial Circuit;

BYRON E. GIPSON, in his official capacity as
Solicitor for South Carolina's 5th Judicial
Circuit; and

WILLIAM WALTER WILKINS III, in his
official capacity as Solicitor for South Carolina's
13th Judicial Circuit.

*Defendants*.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiffs bring this civil rights action under 42 U.S.C. § 1983 to challenge the constitutionality of Senate Bill 1 (hereinafter "SB 1" or "the Act"), South Carolina's latest attempt to prevent patients from exercising their constitutional right to abortion. *See* SB 1, attached as Exhibit A, *to be codified at* S.C. Code Ann. §§ 44-41-610 *et seq*. The Act took effect immediately upon receiving South Carolina Governor Henry McMaster's signature on February 18, 2021. Absent judicial relief, it will cause imminent harm to Plaintiffs and their patients.

2.      The Act bans abortion after the detection of fetal or embryonic cardiac activity, which occurs as early as approximately six weeks of pregnancy, as dated from the first day of a pregnant person's last menstrual period ("LMP"). Because that point in pregnancy is roughly four months before any fetus could be viable after birth, the Act prohibits Plaintiffs from providing previability abortions to their South Carolina patients. A violation of the Act would carry felony criminal penalties, the potential for adverse licensing action, and civil liability.

3.      The Act is an affront to the dignity and health of South Carolinians. In particular, it is an attack on families with low incomes, South Carolinians of color, and rural South Carolinians, who already face inequities in access to medical care and who will bear the brunt of the law's cruelties. South Carolinians face a critical shortage of reproductive health care providers, including obstetrician-gynecologists, and the rate at which South Carolinians, particularly Black South Carolinians, die from pregnancy-related causes is shockingly high.

4.      Rather than working to end these preventable deaths and honoring South Carolinians' reproductive health care decisions, the Legislature has instead chosen to criminalize nearly all abortions. Its adoption of this law is in flagrant violation of nearly five decades of settled Supreme Court precedent, starting with *Roe v. Wade*, 410 U.S. 113 (1973), which held that a

patient has a constitutionally protected right to end a pregnancy prior to viability. Since *Roe*, no court considering the constitutionality of a law that bans abortions beginning at a gestational age prior to viability has upheld that law. To the contrary, decades of unanimous precedent have made clear that a ban on such abortions violates the Fourteenth Amendment to the U.S. Constitution.

5.    Plaintiffs seek declaratory and injunctive relief preventing enforcement of SB 1 to safeguard themselves, their patients, and physicians and other staff from this unconstitutional law.

## JURISDICTION & VENUE

6.    This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7.    Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202; by Rules 57 and 65 of the Federal Rules of Civil Procedure; and by the general legal and equitable powers of this Court.

8.    Venue in this district is proper under 28 U.S.C. § 1391 because the events giving rise to this action occurred in the district, where each of the Plaintiffs provides previability abortion services and where SB 1 would be enforced, and because all of the Defendants reside here.

9.    Under District of South Carolina Local Rule 3.01, this case should be assigned to the Columbia Division because Defendants include the Attorney General, the Director of the Department of Health and Environmental Control, and the Solicitor for South Carolina's 5th Judicial Circuit, all of whom maintain offices in the division. Assignment to the Columbia Division is also proper because Plaintiff Planned Parenthood South Atlantic ("PPSAT") operates a health center in Columbia that provides abortions banned by SB 1 and serves abortion patients who reside in the Columbia Division and whose constitutional rights are violated by the challenged law.

## PARTIES

### A.    Plaintiffs

10.    Plaintiff PPSAT is a nonprofit corporation headquartered in North Carolina. It provides a range of family planning and reproductive health services and other preventive care in South Carolina, including well-person exams; contraception (including long-acting reversible contraception or "LARCs") and contraceptive counseling; gender-affirming hormone therapy as well as menopausal hormone replacement therapy; screening for breast and cervical cancer; screening and treatment for sexually transmitted infections ("STIs"); pregnancy testing and counseling; physical exams; and abortion. PPSAT sues on its own behalf, on behalf of its patients, and on behalf of its physicians and staff.

11.    Greenville Women's Clinic, P.A. ("GWC") is a health care facility in Greenville, South Carolina, that since 1976 has provided reproductive health care, including pregnancy testing, birth control, testing and treatment for STIs, general gynecological care, and abortion. GWC sues on its own behalf, on behalf of its patients, and on behalf of its physicians and staff.

12.    PPSAT and GWC operate the only three abortion clinics in South Carolina. Each of PPSAT and GWC's locations holds a state license to perform first-trimester abortions, *see* S.C. Code Ann. § 44-41-75, which corresponds to abortions up to 14 weeks LMP, *id.* § 44-41-10; *see also see also* S.C. Code Ann. Regs. 61-12.101(S)(4). At each of these facilities, physicians licensed to practice medicine in South Carolina provide abortions.

13.    PPSAT operates two health centers in the state, one in Columbia and the other in Charleston. At each location, PPSAT provides medication abortion up to 11 weeks LMP, and abortion by procedure up to 14 weeks LMP.

5

14.     GWC operates a clinic in Greenville, where it generally provides medication abortion through 10 weeks LMP and abortion by procedure up to 14 weeks LMP.

15.     Dr. Terry L. Buffkin, M.D., is a physician licensed to practice medicine in South Carolina and a co-owner of GWC. He is a board-certified obstetrician/gynecologist ("OB/GYN") who provides a range of reproductive health care to patients, including medication abortion and abortion by procedure up to 14 weeks LMP. Dr. Buffkin brings this claim on behalf of himself and his patients.

**B.     Defendants**

16.     Defendant Alan Wilson is the Attorney General for the State of South Carolina. He is responsible for, among other duties, enforcing the civil and criminal laws of the State. Defendant Wilson has criminal enforcement authority for violations of the Act, pursuant to S.C. Code Ann. § 1-7-40. Moreover, he has the "exclusive right, in his discretion, to assign" solicitors in the State to criminal matters outside their circuits "in case of the incapacity of the local solicitor or otherwise." *Id.* § 1-7-350. He is sued in his official capacity.

17.     Defendant Edward Simmer is the Director of the South Carolina Department of Health and Environmental Control ("DHEC"). He is responsible for directing all DHEC activities. DHEC is responsible for licensing abortion clinics, certifying that they are suitable for the performance of abortions, and taking related enforcement action. *See id.* §§ 44-41-70; 44-41-460(D). He is sued in his official capacity.

18.     Defendant Anne G. Cook is the President of the South Carolina Board of Medical Examiners ("BME"), which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a

majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). She is sued in her official capacity.

19.    Defendant Stephen I. Schabel is Vice President of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

20.    Defendant Ronald Januchowski is Secretary of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

21.    Defendant Jim C. Chow is a Member of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

22.    Defendant George S. Dilts is a Member of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

23.    Defendant Dion Franga is a Member of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

24.    Defendant Richard Howell is a Member of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

25.    Defendant Theresa Mills-Floyd is a Member of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). She is sued in her official capacity.

26.    Defendant Jeffrey A. Walsh is a Member of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

27.    Defendant Christopher C. Wright is a Member of the BME, which is responsible for licensing and disciplining physicians who practice in South Carolina, pursuant to S.C. Code Ann. § 40-47-10. BME has broad authority, upon a majority vote of its members, to discipline a

physician, including through license revocation for a felony conviction. *Id.* § 40-47-110(B)(2). He is sued in his official capacity.

28.    Defendant Scarlett A. Wilson is the Solicitor for South Carolina's 9th Judicial Circuit, which includes the City of Charleston, where PPSAT's Charleston health center is located. In cooperation with the Attorney General, she has criminal enforcement authority for violations of the Act, pursuant to S.C. Code Ann. § 1-7-320. She is sued in her official capacity.

29.    Defendant Byron E. Gipson is the Solicitor for South Carolina's 5th Judicial Circuit, which includes the portion of the City of Columbia where PPSAT's Columbia health center is located. In cooperation with the Attorney General, he has criminal enforcement authority for violations of the Act, pursuant to S.C. Code Ann. § 1-7-320. He is sued in his official capacity.

30.    Defendant William Walter Wilkins, III is the Solicitor for South Carolina's 13th Judicial Circuit, which includes the City of Greenville, where GWC is located. In cooperation with the Attorney General, he has criminal enforcement authority for violations of the Act, pursuant to S.C. Code Ann. § 1-7-320. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.    Prior South Carolina Law

31.    A full-term pregnancy lasts approximately 40 weeks LMP.

32.    Viability is generally understood as the point when a fetus has a reasonable chance for sustained life after birth, with or without artificial support. South Carolina law has long contained a "legal presumption" that "viability occurs no sooner than the twenty-fourth week of

pregnancy," S.C. Code Ann. § 44-41-10(1); *see also* S.C. Code Reg. 61-12, § 101(T), and it has

banned the performance of nearly all post-viability abortions, *see* S.C. Code Ann. § 44-41-450.[1]

33.     As noted above, Plaintiffs operate the only abortion clinics in South Carolina. They

do not provide abortion beyond 14 weeks LMP. Because no embryo or fetus is viable at or before

this time, Plaintiffs perform only previability abortions.

34.     Before the enactment of SB 1, South Carolina law already imposed detailed

requirements on physicians performing, and patients seeking, abortions. These include a mandate

that abortion providers ensure that a patient had available at least 24 hours in advance of an

abortion certain materials prepared by the State. *Id.* § 44-41-330(A)(2), (C). Patients who are

unable to have the opportunity to review the State's biased counseling materials before coming to

Plaintiffs' offices must make two separate visits.

35.     Prior to SB 1's adoption, South Carolina did not require abortion providers to

perform ultrasounds before an abortion, but Plaintiffs performed them when medically indicated.

For example, when patients are unsure of their last menstrual period, ultrasounds can be useful to

pinpoint the gestational age of the pregnancy, which may affect, for example, whether medication

abortion is available.

36.     Early in pregnancy, Plaintiffs generally perform ultrasounds transvaginally,

meaning that a probe is inserted into the patient's vagina. As a pregnancy progresses, they typically

perform transabdominal ultrasounds, which involve placement of a probe onto the patient's bare

abdomen.

---

[1] Indeed, South Carolina has banned even previability abortions beginning at 20 weeks post-fertilization (22 weeks LMP), *see* S.C. Code Ann. § 44-41-450, a restriction that to date has not been challenged in court and which does not affect Plaintiffs' current provision of abortion services.

## II.     The Challenged Act

37.     The South Carolina Senate passed SB 1 on January 28, 2021, and the House of Representatives adopted an identical version of the bill on February 18. Later on February 18, 2021, the Act took immediate effect upon South Carolina Governor Henry McMaster's signature. *See* SB 1, § 9. Governor McMaster had urged the Legislature to adopt the bill and vowed to sign it "immediately."[2]

38.     The Act leaves in place the existing legal presumption that "viability occurs no sooner than the twenty-fourth week of pregnancy," S.C. Code Ann. § 44-41-10(1), and the restriction that already prohibits nearly all post-viability abortions, *id.* § 44-41-450.

39.     However, the Act imposes dramatic changes to South Carolina law by banning abortion after roughly six weeks of pregnancy LMP (the "Six-Week Ban"). The Act also includes new ultrasound, mandatory disclosure, recordkeeping, reporting, and written notice requirements that are closely intertwined with the operation of the Six-Week Ban. *See, e.g.*, SB 1, § 3 (adding S.C. Code Ann. §§ 44-41-640, -650); *id.* § 4 (amending S.C. Code Ann. § 44-41-460(A)); *id.* § 5 (adding S.C. Code Ann. § 44-41-330(A)(1)(b)); *id.* § 6 (amending S.C. Code Ann. § 44-41-60).

40.     The Six-Week Ban provides that "no person shall perform, induce, or attempt to perform or induce an abortion" where the "fetal heartbeat has been detected." SB 1, § 3 (adding S.C. Code Ann. §§ 44-41-680(A), -690). It defines "fetal heartbeat" to include any "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart within the gestational

---

[2] Gov. Henry McMaster, State of the State Address, Jan. 13, 2021 ("Send me the heartbeat bill and I will immediately sign it into law."); Gov. Henry McMaster (@henrymcmaster), Twitter (Jan. 26, 2021, 12:26 PM), https://twitter.com/henrymcmaster/status/1354118432900460544 ("As the Heartbeat Bill goes to the Senate floor today, I urge my colleagues in the General Assembly to send this bill to my desk for my signature!").

sac." *Id.* (adding S.C. Code Ann. § 44-41-610(3)). The term, therefore, covers not just a "heartbeat" in the lay sense, but also early cardiac activity present before development of the cardiovascular system. Such cardiac activity may be detected by transvaginal ultrasound as early as six weeks of pregnancy LMP (and sometimes sooner). Early in pregnancy, even with ultrasound, this activity would not be audible but would instead appear as a visual flicker.

41.    As defined by the Act, a "fetal heartbeat" also need not occur in a fetus to trigger the Act's prohibition on abortion. In the medical field, the developing organism present in the gestational sac during pregnancy is most accurately termed an "embryo" until at least 10 weeks LMP; the term "fetus" is appropriately used after that time. Despite this accepted distinction, the Act defines "human fetus" to include an "individual organism of the species homo sapiens from fertilization [of an egg] until live birth." *Id.* (adding S.C. Code Ann. § 44-41-610(6)).

42.    The Act requires all abortion providers to determine whether the Six-Week Ban applies by newly mandating the performance of a pre-abortion ultrasound for every patient. *Id.* (adding S.C. Code Ann. § 44-41-630). The provider must inform the patient when a "fetal heartbeat" has been detected, along with other State-mandated information designed to discourage the patient who can no longer obtain an abortion at all in South Carolina from going elsewhere to terminate her pregnancy. *Id.* (adding S.C. Code Ann. § 44-41-640); *id.* § 5 (amending S.C. Code Ann. § 44-41-330(A)(1)).

43.    The Six-Week Ban contains only narrow exceptions: (1) to save the life of the pregnant patient; (2) to prevent certain types of irreversible bodily impairment to the patient; (3) in cases of a fetal health condition that is "incompatible" with sustained life after birth, and (4) in narrow circumstances where the pregnancy is the result of rape or incest. *Id.* § 3 (adding S.C. Code Ann. § 44-41-680(B), which cross-references S.C. Code Ann. § 44-41-430(5)). Of note,

the rape and incest exceptions apply only if, within 24 hours of the abortion, the physician reports the alleged rape or incest and the patient's name and contact information to the sheriff in the county where the abortion was performed, irrespective of the patient's wishes, where the alleged crime occurred, and whether the provider has already complied with other mandatory reporting laws, where applicable. *Id.* (adding S.C. Code Ann. § 44-41-680(C)).

44.    Both the physician who performs an abortion, and the clinic in which the abortion is performed, risk severe penalties for violating the Six-Week Ban. Those penalties include a felony offense that carries a $10,000 criminal fine and up to two years in prison. *Id.* § 3 (adding S.C. Code Ann. § 44-41-680(D)); *see also* S.C. Code Ann. § 16-1-40 (accessory liability). Moreover, violation of the Six-Week Ban could result in revocation of a doctor's medical license and a clinic's license to perform abortions. S.C. Code Ann. §§ 40-47-110(A), (B)(2); 44-41-70; 44-41-75(A). The Act also creates a new civil cause of action that authorizes a patient "on whom an abortion was performed or induced" in violation of the Six-Week Ban to sue the abortion provider for damages, and to recoup her court costs and attorney's fees as well. SB 1, § 3 (adding S.C. Code Ann. § 44-41-740).

## III.    Abortion in South Carolina

45.    Legal abortion is one of the safest procedures in contemporary medical practice and is far safer than childbirth. A woman's risk of death associated with childbirth is approximately fourteen times higher than that associated with abortion, and every pregnancy-related complication is more common among women having live births than among those having abortions.[3]

---

[3] Plaintiffs use "woman" or "women" as a short-hand for people who are or may become pregnant, but people of all gender identities, including transgender men and gender-diverse individuals, may also become pregnant and seek abortion services, and would thus also suffer irreparable harm under SB 1.

46.    Abortion is also very common: Approximately one in four women in this country will have an abortion by age forty-five.

47.    Patients seek an abortion for a range of reasons. Many are already mothers, having had at least one child, and they may struggle with basic unmet needs for their families. Other patients decide that they are not ready to become parents because they are too young or want to finish school before starting a family. Some patients have health complications during pregnancy that lead them to conclude that abortion is the right choice for them. In some cases, patients are struggling with substance abuse and decide not to become parents or have additional children during that time in their lives. Still others have an abusive partner or a partner with whom they do not wish to have children for other reasons.

48.    Although patients generally obtain an abortion as soon as they are able, the majority of patients who obtain abortions in South Carolina are at least six weeks LMP into their pregnancy by the time of the abortion.

49.    There are many reasons why most patients do not obtain abortions before six weeks LMP. In a person with regular monthly periods, fertilization typically occurs two weeks after their last menstrual period (2 weeks LMP). Thus, even a person with a highly regular, four-week menstrual cycle would already be 4 weeks LMP when she misses her period, generally the first clear indication of a possible pregnancy. At-home pregnancy tests are not generally effective until at least 4 weeks LMP.

50.    As a result, even a person with regular menstrual cycles might have roughly two weeks before the Six-Week Ban applies to learn she is pregnant, decide whether to have an abortion, and seek and obtain an abortion at one of the three available locations in South Carolina.

The Charleston and Columbia health centers generally offer abortions only two days per week due to operational limitations.

51.    South Carolina abortion providers generally do not initiate an abortion until sometime between 4 and 5 weeks LMP, when a pregnancy can first be located in the uterus using transvaginal ultrasound. Accordingly, even patients who discover that they are pregnant at an early date could have just a matter of days between the point when a pregnancy can be located in the uterus and when an ultrasound would detect cardiac activity.

52.    The hurdles described above apply to patients who learn very early that they are pregnant. But many patients do not know they are pregnant until at or after six weeks LMP, especially patients who have irregular menstrual cycles or who experience bleeding during early pregnancy, a common occurrence that is frequently and easily mistaken for a period. Other patients may not develop or recognize symptoms of early pregnancy.

53.    Particularly for patients living in poverty or without insurance, travel-related and financial barriers also pose a barrier to obtaining an abortion before six weeks LMP. With very narrow exceptions, South Carolina bars coverage of abortion in its Medicaid program and in private insurance plans offered on the State's Affordable Care Act exchange. S.C. Code Ann. §§ 1-1-1035; 38-71-238. Patients living in poverty or without insurance coverage available for abortion must often make difficult tradeoffs among other basic needs like food or rent to pay for their abortions. Many must seek financial assistance from extended family and friends or from local abortion funds to pay for care, a process that takes time. Moreover, many patients must navigate other logistics, such as inflexible or unpredictable job hours and childcare needs, that may delay the time when they are able to obtain an abortion.

54.     The COVID-19 pandemic has only exacerbated these impediments, particularly for Black patients whose communities have been hardest hit by illness and the related economic downturn. Patients understandably fear the health risks of being in a clinic and traveling across the state to obtain health care. In addition, many South Carolinians are navigating job losses or reductions in hours, related loss of health insurance, and a lack of child care due to COVID, all of which may delay the point when a patient recognizes she is pregnant and when she is actually able to obtain an abortion.

55.     As described in part above, South Carolina has enacted numerous medically unnecessary statutory and regulatory requirements that must be met before a patient may obtain an abortion, including that abortion providers ensure that patients had certain State-mandated information available to them at least 24 hours in advance of an abortion. S.C. Code Ann. § 44-41-330(A)(2), (C). South Carolina also prohibits the use of telehealth for medication abortion, closing off a safe and effective option for many patients to obtain an abortion, particularly during the COVID-19 pandemic. *See id.* § 40-47-37(C)(6).

56.     South Carolina also typically requires patients sixteen years old or younger to obtain written parental authorization for an abortion. Without such authorization, a patient must get a court order permitting them to obtain care, *see id*. §§ 44-41-31, -32, -33, which South Carolina law expressly recognizes could take three days, *see id.* § 44-41-32(5), not including time for appeal. That process cannot realistically happen before a patient's pregnancy reaches six weeks LMP. Minor patients without a history of pregnancy may also be less likely to recognize early symptoms of pregnancy than older patients who have been pregnant before.

57.     Patients whose pregnancies are the result of sexual assault or who are experiencing interpersonal violence may need additional time to access abortion services due to ongoing

physical or emotional trauma. For these patients, too, obtaining an abortion before six weeks LMP is exceedingly difficult, if not impossible.

## IV.    The Impact of the Act on Plaintiffs and Their Patients

58.    As described above, the Act prohibits nearly all abortions after approximately six weeks LMP, a point in pregnancy that is many months before viability. Yet the vast majority of abortion patients in South Carolina who obtain abortion do so *after* six weeks LMP.

59.    SB 1 will force Plaintiffs and their physicians to turn away the majority of patients seeking previability abortions, or risk substantial criminal penalties, professional sanctions, and/or civil liability.

60.    The Act will make it virtually impossible to access abortion in South Carolina. Patients who can scrape together the resources will be forced to travel out of state for medical care. Many others who cannot do so will be forced to carry a pregnancy to term against their will or seek ways to end their pregnancies without medical supervision, some of which may be unsafe.

61.    The Act will be particularly devastating for South Carolinians with low-incomes, South Carolinians of color, and rural South Carolinians, who already face inequities in access to medical care and who will bear the brunt of the Act's cruelties. Forcing patients to carry their pregnancies to term will place Black patients, for example, at even greater risk of adverse health outcomes. As described above, the risk of death associated with childbirth is approximately 14 times higher than that associated with abortion, and every pregnancy-related complication is more common in pregnancies ending in live births than among those ending through abortions.

Moreover, Black and other non-white women in South Carolina are 2.6 times more likely to die from pregnancy-related causes than white women.[4]

62.    Each of these consequences constitutes irreparable harm to Plaintiffs' patients and constitutes a violation of the constitutional rights to which they are entitled.

63.    The Act's narrow exceptions to the Six-Week Ban do not cure these constitutional violations. Indeed, even those patients able to qualify for one of the exceptions will be harmed. Because of the Act, the decision to have an abortion—one that a patient is constitutionally entitled to make—will instead be carefully scrutinized. Moreover, the Act will require health care professionals to disclose to a local sheriff the names and contact information of sexual assault survivors in order to provide care to these patients at or after approximately six weeks LMP. This requirement blatantly intrudes on a patient's right to privacy and autonomy and will effectively prevent patients from accessing abortion in South Carolina.

64.    Plaintiffs have no adequate remedy at law.

## CLAIM FOR RELIEF
### (Substantive Due Process)

65.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 64 above.

66.    By banning previability abortion upon identification of embryonic or fetal cardiac activity, which may occur as early as six weeks LMP (or even sooner), the Act violates the substantive due process rights of Plaintiffs' patients to previability abortion, as guaranteed by the Fourteenth Amendment to the U.S. Constitution.

---

[4] S.C. Maternal Morbidity and Mortality Rev. Comm., Legislative Brief (Mar. 2020), https://www.scstatehouse.gov/reports/DHEC/mmmr-2020-Final.pdf.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

67.     Declare that SB 1 is unconstitutional under the Fourteenth Amendment to the U.S. Constitution;

68.     Issue preliminary and permanent injunctive relief, without bond, enjoining Defendants, their employees, agents, and successors from enforcement of SB 1 statewide;

69.     Award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

70.     Grant such other relief as this Court deems just and proper.

Respectfully submitted,

/s/ *M. Malissa Burnette*
M. Malissa Burnette (Fed. Bar No. 1616)
Kathleen McDaniel (Fed. Bar No. 10139)
Grant Burnette LeFever (Fed. Bar No. 12943)
Burnette Shutt & McDaniel, PA
P.O. Box 1929
Columbia, SC 29202
(803) 904-7913
mburnette@burnetteshutt.law
kmcdaniel@burnetteshutt.law
glefever@burnetteshutt.law

*Attorneys for Plaintiffs*

Julie A. Murray*
Hannah Swanson*
Planned Parenthood Federation of America
1110 Vermont Avenue, NW, Suite 300
Washington, DC 20005
(202) 803-4045
julie.murray@ppfa.org
hannah.swanson@ppfa.org

*Attorneys for Plaintiff Planned Parenthood South Atlantic*

Alexandra S. Thompson*
Michelle Moriarty*
Jennifer Beard*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
(917) 637-3639
athompson@reprorights.org
mmoriarty@reprorights.org
jbeard@reprorights.org

*Attorneys for Plaintiffs Greenville Women's Center and Dr. Terry L. Buffkin*

* *Admitted pro hac vice / to be filed*

Dated: March 10, 2021