

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# COLUMBIA DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTH ATLANTIC *et al.*, | § § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Civil Action No.: 3:21-00508-MGL |
| | § | |
| ALAN WILSON, *in his official capacity as Attorney General of South Carolina, et al.*, | § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER GRANTING
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## I.   INTRODUCTION

Planned Parenthood South Atlantic (PPSAT), on behalf of itself, its patients, and its physicians and staff; Greenville Women's Clinic, on behalf of itself, its patients, and its physicians and staff; and Terry L. Buffkin, M.D., on behalf of himself and his patients (collectively, Plaintiffs), filed an amended complaint for declaratory and injunctive relief against Alan Wilson, in his official capacity as Attorney General of South Carolina (AG Wilson); Edward Simmer, in his official capacity as Director of the South Carolina Department of Health and Environmental Control (DHEC); Anne G. Cook, in her official capacity as President of the South Carolina Board of Medical Examiners (SCBME); Stephen I. Schabel, in his official capacity as Vice President of the SCBME; Ronald Januchowski, in his official capacity as Secretary of the SCBME; Jim C. Chow, in his official capacity as a Member of the SCBME; George S. Dilts, in his official capacity

as a Member of the SCBME; Dion Franga, in his official capacity as a Member of the SCBME; Richard Howell, in his official capacity as a Member of the SCBME; Theresa Mills-Floyd, in her official capacity as a Member of the SCBME; Jeffrey A. Walsh, in his official capacity as a Member of the SCBME; Christopher C. Wright, in his official capacity as a Member of the SCBME; Scarlett A. Wilson, in her official capacity as Solicitor for South Carolina's 9th Judicial Circuit (Solicitor Wilson); Byron E. Gipson, in his official capacity as Solicitor for South Carolina's 5th Judicial Circuit (Gipson); and William Walter Wilkins, III, in his official capacity as Solicitor for South Carolina's 13th Judicial Circuit (Wilkins) (collectively, Defendants).

In Plaintiff's amended complaint, pursuant to 42 U.S.C. § 1983, they challenge the constitutionality of the South Carolina Fetal Heartbeat and Protection from Abortion Act, S.1, R-2, Act. No 1 of 2021 (S.1 or the Act).  Plaintiffs have moved for a preliminary injunction to restrain Defendants, their employees, agents, successors, and all others acting in concert or participating with them, from enforcing the Act.  Having carefully considered the motion, the responses, the replies, the oral argument, the record, and the relevant law, the Court is of the opinion the motion should be granted.


## II.      FACTUAL AND PROCEDURAL HISTORY

### A.      *Factual History*

The Act provides that "no person shall perform, induce, or attempt to perform or induce an abortion" where the "fetal heartbeat has been detected." S.1, § 3 (adding S.C. Code Ann. § 44-41-680(A)).  It defines "fetal heartbeat" to include any "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." *Id.* (adding S.C. Code Ann. § 44-41-610(3)).

The Act also includes new mandatory ultrasound, mandatory disclosure, recordkeeping, reporting, and written notice requirements that are closely intertwined with the operation of the prohibition on abortion after detection of cardiac activity. *See, e.g.,* S.1 § 3 (adding S.C. Code Ann. §§ 44-41-630, -640, -650); *id.* § 4 (amending S.C. Code Ann. § 44-41-460(A)); *id.* § 5 (adding S.C. Code Ann. § 44-41-330(A)(1)(b)); *id.* § 6 (amending S.C. Code Ann. § 44-41-60).

### B.     Procedural History

Governor McMaster signed the Act into law on February 18, 2021. Several hours prior to Governor McMaster signing the Act into law, Plaintiffs filed their complaint and a motion for a temporary restraining order (TRO) and preliminary injunction (Pls.' Mot.). On the following day, AG Wilson, Wilkins, and Solicitor Wilson filed their response, DHEC filed a response adopting AG Wilson, Wilkins, and Solicitor Wilson's response, and the SCBME defendants filed their response.

The Court held a hearing on Plaintiffs' motion for a TRO, after which it granted the motion. Gipson and the SCBME defendants entered into separate stipulations with Plaintiffs whereby they "agree[d] not to investigate or prosecute based on [the Act] until such time as a final, non-appealable judgment has been issued in this matter[,]" Gipson Stipulation at 1; SCBME Stipulation at 2, and Plaintiffs agreed to withdraw their requests for injunctive relief as to them. Solicitor Wilson, in an effort to minimize legal costs and efforts, declined to file further briefing on Plaintiffs' request for injunctive relief.

Defendants AG Wilson and Wilkins filed a supplemental response (Suppl. Return of AG Wilson and Wilkins), and Governor Henry McMaster, in his official capacity as Governor of the State of South Carolina, (Governor McMaster) filed a motion to dissolve the TRO (McMaster Br.). The Court subsequently extended the TRO for another fourteen days.

Plaintiffs filed their reply to AG Wilson and Wilkins's supplemental response (Pls.' Reply in Supp. Mot. for Prelim. Inj.) and the Court then held a hearing on Plaintiffs' motion for a preliminary injunction. Thereafter, the Court allowed Governor McMaster and South Carolina House of Representatives Speaker James H. Lucas, in his official capacity as Speaker of the South Carolina House of Representatives, to permissibly intervene in this action pursuant to Fed. R. Civ. P. 24(b)(1)(B). As to Plaintiffs' request for injunctive relief, Speaker Lucas failed to file any briefing.

Plaintiffs filed their response to Governor McMaster's motion (Pls.' Suppl. Reply) and also filed an amended complaint that includes allegations based on Governor McMaster's signing of the Act and the law's current effect. Governor McMaster subsequently replied (McMaster Reply).

The Court, having been fully briefed on the relevant issues, will now adjudicate Plaintiffs' motion for a preliminary injunction.

## III.    STANDARD OF REVIEW

"[P]reliminary injunctions are intended to meet exigent circumstances[.]" *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 84 (3d Cir. 1982). They are "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "[T]he party seeking [a preliminary injunction] must prove [its] own case and adduce the requisite proof, by a preponderance of the evidence, of the conditions and circumstances upon which [it] bases the right to and necessity for injunctive relief." *Citizens Concerned for Separation of Church & State v. City of Denver*, 628 F.2d 1289, 1299 (10th Cir. 1980).

A preliminary injunction should issue only when the plaintiff can "[1] establish that [it is] likely to succeed on the merits, [2] that [it is] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that [injunctive relief] is in the public interest." *Winter*, 555 U.S. at 20. The burden is on the party seeking injunctive relief to show it is entitled to the relief, not the burden of the other party to show the movant is not entitled. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 443 (1974).

"[A]ll four requirements must be satisfied." *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009). Thus, even a strong showing of likely success on the merits cannot compensate for failure to show likely injury. *Winter*, 555 U.S. at 21–22. And, irreparable injury alone is insufficient to support equitable relief. *See id.* at 23 (holding irreparable injury was likely to occur, but holding injunctive relief was improper because of the burden on the government and the impact on public interest). In other words, "[a] preliminary injunction shall be granted only if the moving party clearly establishes entitlement." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017).

"Given [the] limited purpose [of a preliminary injunction], and given the haste that is often necessary . . . , [they are] customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "Because [the] proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, 137 S. Ct. 1239 (2017).

## IV.    DISCUSSION AND ANALYSIS

### A.    *Whether Plaintiffs have standing to bring this lawsuit*

Governor McMaster has challenged Plaintiffs' standing to bring this lawsuit.  Thus, the Court must decide that issue before it can consider the merits of Plaintiffs' constitutional claim. *See Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) ("[A]ny [organization] invoking the power of a federal court must demonstrate standing to do so.").

Governor McMaster argues Plaintiffs lack standing for two reasons.  As to the first, he contends "Plaintiffs cannot challenge an unenacted bill[,]" as they filed this lawsuit prior to him signing the bill into law.  McMaster Br. at 9.

Plaintiffs, in their supplemental reply, note "they have now filed an amended complaint that includes allegations based on the Governor's signature and the law's current effect, which will eliminate the need for this Court to even address the argument."  Pls.' Suppl. Reply at 3.

In his reply, Governor McMaster avers "the TRO would need to be dissolved and Plaintiffs' pending motion for a preliminary injunction denied as moot, for both are based on a complaint that is now a nullity."  McMaster Reply at 3.

"[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."  *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457, 473–74 (2007).  Accordingly, in the instant case, Plaintiffs' filing of an amended complaint "that includes allegations based on the Governor's signature and the law's current effect," Pls.' Suppl. Reply at 3, moots Governor McMaster's argument Plaintiffs lack standing to challenge an unenacted bill.

Also, the Court concludes Governor McMaster's contention Plaintiffs' amended complaint necessitates the Court dissolve the TRO and deny the motion for preliminary injunction as moot

is without merit.  As an initial matter, his argument as to the TRO is now moot due to this Order. And, regarding Plaintiffs' motion for a preliminary injunction, the Court will treat that filing as directed at the amended complaint.

Turning to Governor McMaster's second argument challenging Plaintiffs' standing to bring this lawsuit, he maintains Plaintiffs have failed to show "any of the elements of third-party standing" because "they have not suggested a close relationship with such women, much less any hindrance to women asserting their own rights."  McMaster Br. at 2.

Plaintiffs, in their supplemental reply, posit Governor McMaster's argument is directly undercut by decades of Supreme Court precedent.

As to third-party standing, the Supreme Court has long established that abortion providers have standing to assert their patients' rights.  *See Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (noting that abortion providers are "uniquely qualified to litigate the constitutionality of the [s]tate's interference with, or discrimination against" the patient's decision to have an abortion.).

The Supreme Court has also recognized the standing of abortion providers to sue on their own behalf when challenged legislation or regulations operate directly against them.  *See Planned Parenthood of Cen. Mo. v. Danforth*, 428 U.S. 52, 62 (1976) (internal citation omitted) (footnote omitted) (noting that the physician-appellants in that case have standing because they "assert a sufficiently direct threat of personal detriment.  They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.").

These standing principles were recently reaffirmed, as noted by Plaintiffs, in *June Med. Servs., LLC v. Russo*, 140 S. Ct. 2103 (2020), where the majority opined abortion providers have standing to assert the constitutional rights of their patients.  *Id.* at 2118 ("We have long permitted

abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations.").

As with the plaintiffs in *Russo*, Plaintiffs here bring this action to assert the constitutional rights of their patients and to challenge a law that subjects Plaintiffs to "felony criminal and other penalties for running afoul of" the Act. Pls.' Mot. at 1. Accordingly, the Court concludes Plaintiffs have third-party standing to sue.

### B.     *Whether Plaintiffs are able to establish they are likely to succeed on the merits*

Turning to the first requirement, Plaintiffs claim they are likely to succeed on the merits of their claim. In doing so, they claim the Act is "blatantly constitutional" and "[s]ince *Roe*, courts considering the constitutionality of laws that ban abortions beginning at a gestational age prior to viability have universally invalidated those laws, including some in which the prohibition began several months later in pregnancy than [the Act's] Six-Week Ban would." *Id.* at 11, 13.

Defendants AG Wilson, Wilkins, and Governor McMaster contend Plaintiffs are unable to establish a likelihood of success on the merits. As to AG Wilson and Wilkins, their briefing focuses almost exclusively on the Supreme Court's decision in *Gonzales v. Carhart*, 550 U.S. 124 (2007). Specifically, AG Wilson and Wilkins contend the Supreme Court in *Gonzales* "employed [*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)] undue burden standard, [but] considerably relaxed that standard" and determined "a ban upon a particular form of abortion—even prior to viability—was deemed constitutionally acceptable[.]" Suppl. Return of AG Wilson and Wilkins at 6, 8.

Governor McMaster argues Plaintiffs, and the Court, in its February 19, 2021, Order granting their motion for a TRO, misapplied the holding of *Casey* as to previability abortion restrictions. In particular, Governor McMaster contends "[p]reviability regulations are subject to

8

*Casey*'s undue burden standards[,]" and "binding precedent forecloses Plaintiffs' legal argument that any previability limitation on abortion is automatically unconstitutional."  McMaster Br. at 23–24 (emphasis modified).

The Supreme Court has held that a state may not "prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Casey*, 505 U.S. at 879.  "*Casey* reaffirmed the most central principle of *Roe v. Wade* [410 U.S. 113 (1973),] a woman's right to terminate her pregnancy before viability[.]"  *Russo*, 140 S. Ct. at 2135 (Roberts, C.J., concurring) (internal citations and quotations omitted).  The Supreme Court has declined to revisit the legal principle that "before 'viability . . . the woman has a right to choose to terminate her pregnancy.'" *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) (quoting *Casey*, 505 U.S. at 870).

Moreover, "[b]efore viability, the [s]tate's interests are not strong enough to support a prohibition on abortion or the imposition of a substantial obstacle to the woman's effective right to elect" an abortion procedure.  *Casey*, 505 U.S. at 846.  Put another way, "Before viability, a [s]tate 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'"  *Carhart*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 879).

In addition, the South Carolina Code establishes a legal presumption that "viability occurs no sooner than the twenty-fourth week of pregnancy," S.C. Code Ann. § 44-41-10(l), a presumption supported by Plaintiff PPSAT's Chief Medical Officer (Dr. Farris), who declared: "Although variable by pregnancy, viability is generally understood as the point when a fetus has a reasonable likelihood of sustained survival after birth, with or without artificial support." Declaration of Katherine Farris, M.D. ("Farris Decl.") ¶ 20, Pls.' Mot. at Ex. B.  And, viability is "medically impossible" at six weeks of pregnancy, or at any time in the first trimester of pregnancy, when Plaintiffs provide abortion services in South Carolina.  *Id.* ¶ 21.

9

Yet the Act expressly bars the provision of nearly all abortions in South Carolina upon detection of embryonic or fetal "cardiac activity," S.1, § 3 (adding S.C. Code Ann. § 44-41-680), which may occur as early as six weeks of pregnancy, or even sooner.  For example, "Sometimes th[e] flicker [of an electrical impulse that constitutes cardiac activity] is visible as early as partway through the fifth week [last menstrual period (LMP)].").  Farris Decl. ¶ 23, Pls.' Mot. at Ex. B.

Consequently, because the Court holds the Act bans abortion months before any fetus could be viable, Plaintiffs are likely to succeed on their claim that the Act is unconstitutional.  Indeed, courts have universally invalidated laws that ban abortions beginning at a gestational age prior to viability.  *See, e.g., Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 269 (5th Cir. 2019) (15-week ban); *MKB Mgmt. Corp. v. Stenehjem*, 795 F.3d 768, 776 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 981 (2016) (6-week ban); *Edwards v. Beck*, 786 F.3d 1113, 1115 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 895 (2016) (12-week ban); *McCormack v. Herzog*, 788 F.3d 1017, 1029 (9th Cir. 2015) (equivalent of 22-week LMP ban); *Isaacson v. Horne*, 716 F.3d 1213, 1217 (9th Cir. 2013), *cert. denied*, 571 U.S. 1127 (2014) (20-week ban); *Jane L. v. Bangerter*, 102 F.3d 1112 (10th Cir. 1996) (equivalent of 22-week LMP ban); *Sojourner T v. Edwards*, 974 F.2d 27, 31 (5th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993) (ban at all gestational ages); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 962 F.2d 1366, 1368–69 (9th Cir. 1992), *cert. denied*, 506 U.S. 1011 (1992) (ban at all gestational ages); *SisterSong Women of Color Reprod. Justice Collective v. Kemp*, 472 F. Supp. 3d 1297, 1312 (N.D. Ga. 2020) (ban upon cardiac activity), *appeal filed*, No. 20-13024 (11th Cir. Aug. 11, 2020); *Memphis Ctr. for Reprod. Health v. Slatery*, No. 3:20-CV-00501, 2020 WL 4274198, at *2 (M.D. Tenn. July 24, 2020) (preliminary injunction of ban upon cardiac activity), *appeal filed*, No. 20-5969 (6th Cir. Aug. 24, 2020); *Bryant v. Woodall*, 363 F. Supp. 3d 611, 630–31 (M.D.N.C. 2019) (20-week ban), *appeal filed on other*

*grounds*, No. 19-1685 (4th Cir. June 26, 2019); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, No. 3:19-CV-178-DJH, 2019 WL 1233575, at *2 (W.D. Ky. Mar. 15, 2019) (temporary restraining order of ban upon cardiac activity); *Preterm-Cleveland v. Yost*, 394 F. Supp. 3d 796, 804 (S.D. Ohio 2019) (preliminary injunction of ban upon cardiac activity).

Lastly, AG Wilson and Wilkins's interpretation of the Supreme Court's decision in *Gonzalez* is incorrect.  In fact, the Supreme Court in *Gonzalez* specifically stated "[w]e assume the following principles for the purposes of this opinion.  Before viability, a [s]tate 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'"  *Gonzalez*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 879).  And, as noted by Plaintiffs, "an unbroken line of cases since *Gonzalez* has uniformly adhered to [the previability rule of *Casey*], regardless of the [s]tate's asserted interests or whether abortion earlier in pregnancy remains available."  Pls.' Reply in Supp. Mot. for Prelim. Inj. at 4.

Thus, the Court concludes Plaintiffs have established a substantial likelihood of success on the merits of their claim that the Act is unconstitutional.

### C.    *Whether Plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief*

As to the second requirement, Plaintiffs claim they are likely to suffer irreparable harm in the absence of preliminary relief.  They contend the Act will deny their patients "access to timely and constitutionally protected previability abortions."  Pls.' Mot. at 14.

AG Wilson and Wilkins's expert, Dr. Ingrid Skop, avers Plaintiffs fail to show irreparable harm because "the vast majority of women have sufficient time to obtain an abortion prior to the point of a detectable heartbeat."  Expert Report of Dr. Ingrid Skop ¶ 8, AG Wilson and Wilkins's Suppl. Return at Ex. B.

Governor McMaster contends "[b]ased on [Plaintiffs'] Complaint, the only possible injury would be loss of business, but it is well-settled that such monetary injuries do not constitute irreparable harm." McMaster Br. at 33.

As to AG Wilson and Wilkins's argument, Plaintiffs' argue Skop's opinion "is at odds with actual data from South Carolina." Pls.' Reply in Supp. Mot. for Prelim. Inj. at 10. In support of this contention, Plaintiffs cite to Dr. Farris's declaration that states "[i]n 2020, approximately 96% of all abortions that [Plaintiff PPSAT] performed in South Carolina were done at [six] weeks LMP or later." Farris Decl. ¶ 31, Pls.' Mot. at Ex. B.

Responding to Governor McMaster's argument, Plaintiffs posit his position is "based on the incorrect assertion that Plaintiffs have no third-party standing[,]" and when third-party standing is shown, as is the case here, "a litigant need not show irreparable harm to itself, so long as the irreparable harm would occur for the third party whose rights are actually at issue." Pls.' Suppl. Reply at 7.

Any deprivation of constitutional rights "for even minimal periods of time[] unquestionably constitutes irreparably injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "*Roe v. Wade* . . . establish[ed] beyond argument that denial under color of law of the right to abort . . . constitutes irreparable injury . . . ." *Doe v. Charleston Area Med. Ctr., Inc.*, 529 F.2d 638, 644 (4th Cir. 1975).

Here, the Court concludes Plaintiffs' patients are likely to suffer irreparable injury absent a preliminary injunction. To avoid the Act's effects, Plaintiffs have demonstrated they will be forced to stop providing abortion services to the vast majority of their patients. As noted by Dr. Farris, "The Act's impact will be harshest for [Plaintiffs'] patients with low incomes, patients of color, and patients who live in rural areas. Roughly half [of Plaintiffs'] abortion patients in South

Carolina health centers are Black, and in 2020, those health centers provided abortion services to patients residing in all but three South Carolina counties." Farris Decl. ¶ 47, Pls.' Mot. at Ex. B.

Plaintiffs have also demonstrated that their patients would suffer a range of other financial, physical, mental, and emotional harms caused by a denial of access to abortion in South Carolina. Dr. Farris notes, in her declaration, "In [her] experience, women decide to have abortions for a variety of reasons, including to protect or preserve their physical or mental health, to provide care to existing children and family members, to avoid forgoing educational or economic opportunities due to unplanned childbirth . . . ." Farris Decl. ¶¶ 52–58, Pls.' Mot. at Ex. B. And, these harms, the Court concludes, likewise "constitute irreparable injury." *Doe*, 529 F.2d at 644.

Consequently, the Court concludes Plaintiffs have shown they are likely to suffer irreparable harm if the Court fails to grant the preliminary injunction.

### D.     *Whether the balance of equities tip in Plaintiffs' favor*

Regarding the third requirement, Plaintiffs argue the balance of equities clearly tips in their favor because their "patients will unquestionably face a far greater harm while [the Act] is in effect than Defendants would face if the court entered an injunction to preserve the status quo." Pls.' Mot. at 16.

AG Wilson and Wilkins contend because "the vast majority of women have sufficient time to obtain an abortion under the Act, and because of the State's strong interest in protecting unborn life as well as the health of the mother, the equities favor the state." AG Wilson and Wilkins's Suppl. Return at 17 (internal citation omitted) (footnote omitted).

Governor McMaster avers the balance of equities favor his position because "Plaintiffs will suffer no irreparable harm while their case is litigated, and the State of South Carolina has a profound interest in seeing its law—passed by overwhelming majorities of the People's

representatives and signed by the Governor—respected and enforced." McMaster Br. at 34.

Here, the State of South Carolina is "in no way harmed by [the] issuance of a preliminary injunction which prevents it from enforcing" a law that "is likely to be found unconstitutional." *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003). "If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted). Hence, the Court concludes the balance of equities tip in Plaintiffs' favor.

### E.    Whether injunctive relief is in the public interest

And, as to the fourth, and final, requirement, Plaintiffs posit injunctive relief is in the public interest because "the public has a particularly strong interest in a speedy injunction here to block a law whose basis runs afoul of nearly fifty years of Supreme Court precedent and where temporary relief would merely preserve the longstanding status quo on which South Carolinians seeking an abortion have come to rely." Pls.' Mot. at 17.

AG Wilson and Wilkins posit the state's "strong interest in protecting unborn human life, as well as the health of the mother," AG Wilson and Wilkins's Suppl. Return at 17, indicates a strong public interest in denying Plaintiffs' motion for a preliminary injunction. Governor McMaster likewise references the state's interest in protecting unborn human life, as well as the mother and the medical profession in general, in support of his contention injunctive relief is not in the public interest.

Plaintiffs respond to these arguments and assert the enforcement of "an injunction against a plainly unconstitutional law" such as the Act favors the public interest and ensures "[t]he constitutional rights of South Carolinians, including the right to end a pregnancy, are not subject to the political aspirations or whims of legislators." Pls.' Reply in Supp. Mot. for Prelim. Inj. at

11.

Here, the public interest is served by the entry of an injunction necessary to "uphold[] constitutional rights." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 248 (4th Cir. 2014) (quoting *Newsom*, 354 F.3d at 261); *accord Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 190 (4th Cir. 2013) (en banc).  And, because South Carolina already bans nearly all abortions after viability, *see* S.C. Code Ann. § 44-41-450 (stating "[n]o person shall perform or induce . . . and abortion . . . when it has been determined . . . that the probable post-fertilization age of the woman's unborn child is twenty or more weeks . . . .), the only effect of an injunction would be to prevent South Carolina from enforcing its unconstitutional ban on previability abortions.  As such, the Court concludes injunctive relief is in the public interest.

Consequently, Plaintiffs meet the four requirements necessary for the Court to issue injunctive relief.

### F.    Whether the Act is severable

In case the Court concludes the Act is unconstitutional, AG Wilson and Wilkins aver the Act is severable, and Plaintiffs contend the opposite is true.  Prior to addressing the parties' arguments, the Court will provide a brief summary of some of the key provisions of the Act.

S.C. Code Ann. § 44-41-680 specifically prohibits abortions after the detection, by a mandatory ultrasound made pursuant to Section 44-41-630, of a fetal heartbeat.  Section 44-41-610 defines a fetal heartbeat; Section 44-41-650 imposes penalties for violating the Act; Section 44-41-660 precludes application of the penalties proscribed in Section 44-41-650 in the event an abortion is performed in contravention of Section 44-41-680 for medical emergencies; Section 44-41-670 precludes application of the penalties proscribed in Section 44-41-650 when an abortion is performed on a fetus with no detectable heartbeat; and, Section 44-41-690 allows for

noncompliance with the Act in the event an abortion is required to prevent a serious risk to the health of the pregnant mother. The aforementioned provisions are all located in Section 3 of the Act.

Sections 4 and 6 of the Act involve reporting requirements as to whether the Act was followed. These reporting requirements are amendments to already existing provisions of the S.C. Code. Section 5 of the Act requires mandatory disclosure about the detection of cardiac activity after completing the mandatory ultrasound as set forth in Section 44-14-630. Likewise, these disclosure requirements are amendments to already existing provisions of the S.C. Code.

Turning to the parties arguments, AG Wilson and Wilkins, in their supplemental response, aver Section 44-41-680 should be the only provision of the Act "that should be subject to consideration as to this Motion [for preliminary injunction] because it is the only one that bars abortions after the heartbeat is detected." Suppl. Return of AG Wilson and Wilkins at 2. In particular, AG Wilson and Wilkins argue the "Act contains numerous other provisions that should not be subject to [Plaintiffs'] Motion [for a preliminary injunction] because they do not bar abortions . . . ." *Id.* In support of their argument, AG Wilson and Wilkins cite the Act's "strong severability clause", *Id.* at 16, that states:

> If any section, subsection, paragraph, subparagraph, sentence, clause, phrase, or word of this act is for any reason held to be unconstitutional or invalid, then such holding shall not affect the constitutionality or validity of the remaining portions of this act, the General Assembly hereby declaring that it would have passed this act and each and every section, subsection, paragraph, subparagraph, sentence, clause, phrase, and word thereof, irrespective of the fact that any one or more other sections, subsections, paragraphs, subparagraphs, sentences, clauses, phrases, or words hereof may be declared to be unconstitutional, invalid, or otherwise ineffective.

S.1, § 7.

Similarly, Governor McMaster maintains the Act's disclosure, recordkeeping, and

reporting requirements "have independent, valid purposes, as evidenced by the fact that similar provisions have been widely enacted-and widely upheld in court[.]"  McMaster Reply at 9.

Plaintiffs, on the other hand, maintain none of the provisions as set forth in the Act may be severed from Section 44-41-680.  In support of their argument, Plaintiffs categorize the other provisions of the Act into two groups.  As to the first, Plaintiffs group the provisions in Section 3 serving alongside Section 44-41-680 and posit they "must be enjoined because they are inextricably" intertwined.  Pls.' Reply in Supp. Mot. for Prelim. Inj. at 13.  Regarding the second group, Plaintiffs group the amended provisions of Sections 4, 5, and 6 of the Act and contend their existence "would make no sense were [Section 44-41-680] enjoined." *Id.* at 14.

State law governs severability of a state statute.  *See United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 509 fn 8 (1993) (noting that "severability [of a state statute] . . . is a question of state law.").  Under South Carolina law, the "test for severability is whether the constitutional portion of the statute remains complete in itself, wholly independent of that which is rejected, and is of such a character that it may fairly be presumed the legislature would have passed it independent of that which conflicts with the constitution." *Joytime Distrib. and Amusement Co. v. State*, 528 S.E.2d 647, 648–49 (S.C. 1999).

"When the residue of an Act, sans that portion found to be unconstitutional, is capable of being executed in accordance with the Legislative intent, independent of the rejected portion, the Act as a whole should not be stricken as being in violation of a Constitutional [p]rovision." *Dean v. Timmerman*, 206 S.E.2d 665, 669 (S.C. 1959).

Here, the Court will first address the provisions of Section 3 that serve alongside S.C. Code Ann. § 44-41-680.  The Court's analysis must begin with the mandatory ultrasound disclosure provision, Section 44-41-630, as Section 44-41-680 operates only after a mandatory ultrasound is

taken.  The only purpose of this mandatory ultrasound provision, Section 44-41-630, is to facilitate S.C. Code Ann. § 44-41-680.  And, inasmuch as the Court concludes Plaintiffs are entitled to relief from the results of Section 44-41-680, Section 44-41-630 is also subject to the injunction. Furthermore, a review of the remaining provisions of Section 3 of the Act lead to the inescapable conclusion they are also so intertwined with Sections 44-41-630, -680, so as to preclude severability.  Put differently, the other provisions of Section 3 are not "wholly independent[,]" *Joytime*, 528 S.E.2d at 648–49, and are unable to stand by themselves absent Sections 44-41-630, -680.  Accordingly, the Court concludes the provisions of the Act set forth in Section 3 are not severable and will be enjoined.

A review of the statutory amendments as set forth in Sections 4, 5, and 6 of the Act contain language that references the words "fetal heartbeat" as it is defined in Section 44-41-610(3), or other provisions of Section 3.  Stated differently, Sections 4, 5, and 6 are mutually dependent on Section 3 of the Act.  Thus, if Section 3 of the Act is subject to the injunction, which it will be, the statutory amendments as set forth in Sections 4, 5, and 6 must be enjoined as well.

Accordingly, for purposes of the preliminary injunction, the Court will decline to sever any provisions of the Act.  Thus, the entire Act is subject to the preliminary injunction.

### G.    Whether the Court should issue the preliminary injunction without bond

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Rule 65(c).  But, the Court has discretion to waive posting of a bond in an appropriate case.  *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement.").  Because, as the Court noted above, the State of South Carolina is "in no

way harmed by [the] issuance of a preliminary injunction which prevents it from enforcing" a law that "is likely to be found unconstitutional[,]"*Albemarle Cnty. Sch. Bd.*, 354 F.3d at 261, the Court concludes the preliminary injunction should issue without bond.

* * * * *

"The question, whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case." *Fletcher v. Peck*, 10 U.S. 87, 128 (1810) (Marshall, Ch. J.). Therefore, "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Id.* Or, put another way, "[i]t is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in [favor] of its validity, until its violation of the constitution is proved beyond all reasonable doubt." *Ogden v. Saunders*, 25 U.S. 213, 270 (1827) (Washington, J.).

This is why, when the constitutionality of a state statute is questioned, as Plaintiffs are doing here, the Court is always deferential to the General Assembly's judgment. It thus began its consideration of Plaintiffs' motion for a preliminary injunction with the assumption the Act, passed by the General Assembly and signed by Governor McMaster, was constitutional. As the Court has explained above, however, the Act's mandates run sideways into the presumption it is constitutional "such that the [Court] feels a clear and strong conviction of [the Act's and the Constitution's] incompatibility with each other." *Fletcher*, 10 U.S. at 128. It is that simple, and that complex.

Nevertheless, the Court is well aware some may think the politics of the President who appointed it, and not the law, not the Court's sleepless nights, and not its herculean efforts to get it right, is a consideration and serves as a barometer as to how this Court would rule upon the abortion question presented here. And, unwittingly or not, the media tends to feed this narrative by often noting the name of the President who appointed the federal judge assigned to a particular politically divisive matter such as this.

But, such a suggestion is misinformed at best, and highly offensive at worst. We judges are not politicians in robes. Or, as Supreme Court "Chief Justice Roberts said: 'We do not have Obama judges or Trump judges, Bush judges or Clinton judges. What we have is an extraordinary group of dedicated judges doing their level best to do equal right to those appearing before them.'" Jess Bravin, *No Obama or Trump Judges Here, Appointees of Both Declare*, The Wall Street Journal, Sept. 15, 2019. At a panel at William & Mary Law School, then potential nominee, now a Supreme Court Justice, Amy Coney Barrett agreed with that sentiment: "The chief justice, I think, articulated what members of the judiciary feel[.]" *Id.*

They are both correct. That is why no one who reads either this Court's opinions, or the opinions of its highly esteemed colleagues on the District of South Carolina Court, can divine from our decisions the political party of the President who appointed us. To echo Chief Justice Roberts's and Justice Barrett's comments, we are neither Democrat nor Republican courts. We are Article III constitutional courts. Period.

As to the Supreme Court precedent that controls the outcome in Plaintiffs' motion, Justice Brett Kavanaugh, referring to *Roe v. Wade* during his confirmation hearings, stated "that the 1973 case 'has been reaffirmed many times over the past [forty-five] years, as you know.'" https://www.cnbc.com/2018/09/05/supreme-court-nominee-brett-kavanaugh-says-landmark-abor

tion-ruling-roe-v-wade-is-important-precedent.html (last accessed March 18, 2021). "He said that the Supreme Court's ruling in *Planned Parenthood v. Casey* added force to the court's legal reasoning. It was 'precedent on precedent,' he said." *Id*. "'The Supreme Court didn't just reaffirm it in passing,' he said." *Id*. Justice Kavanaugh's suggestion, then, is that the more often the Supreme Court reaffirms its own precedent, the stronger that precedent has become.

Thus, it is nothing short of baffling when Defendants here make the fanciful, misbegotten, and misguided argument that the Act is constitutional, although surely, all the while knowing full well that it is not. The alternative suggestion is just as puzzling: that, because the composition of the Court has changed in recent years, Defendants' probability that the newly-constituted Supreme Court will rule in their favor in this matter is good. As the theory evidently goes, the three justices most recently appointed to the Supreme Court are secretly scheming to overturn both *Roe v. Wade* and *Planned Parenthood v. Casey* because they are personally opposed to abortion.

The Court easily rejects such a notion. It has a much higher opinion of the High Court than that. After all, law libraries are chock-full of judicial opinions affirming a woman's right to abort a pregnancy before viability, although the authoring judges and justices of those decisions were and are personally fiercely opposed to woman having such a right. Those judges' and justices' individual opinions on the matter was and is immaterial to their rulings. And, that is as it should be.

This case does not present a close call. In fact, based on the law, the Court is unable to fathom how another court could decide this issue differently than how this Court has decided it. As such, it is confident no reviewing court will conclude the Court has abused its discretion in granting Plaintiff's request for a preliminary injunction to stay the enforcement of the unconstitutional Act. *See Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 664 (2004)

("[The Supreme] Court, like other appellate courts, has always applied the abuse of discretion standard on review of a preliminary injunction."). After all, there is no abuse of discretion when the Court follows the law.

When the history of the District of South Carolina Court is written, it will show that we were neither liberals nor conservatives, Democrats nor Republicans. It will instead establish that we did our level best to follow the law. That is certainly what the Court has done here.

## V.    CONCLUSION

Wherefore, based on the foregoing discussion and analysis, it is the judgment of the Court Plaintiffs' motion for a preliminary injunction is **GRANTED** and Defendants and their employees, agents, successors, and all others acting in concert or participating with them, are **PRELIMINARILY ENJOINED** from enforcing the Act statewide while Plaintiffs' claims remains pending in this Court. As a result, the State of South Carolina's abortion laws that were in effect prior to the passage of the Act remain in effect, and Governor McMaster's motion to dissolve the TRO is **RENDERED AS MOOT**.

Plaintiffs shall not be required to post bond.

**IT IS SO ORDERED.**

Signed this 19th day of March 2021, in Columbia, South Carolina.

s/ Mary Geiger Lewis
MARY GEIGER LEWIS
UNITED STATES DISTRICT JUDGE